UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

JAMES PAUL BLAKELEY Plaintiff

v. Civil Action No. 3:25-cv-15-RGJ

THE BETTER BUSINESS BUREAU, INC. Defendant

* * * * *

**MEMORANDUM OPINION AND ORDER**

Defendant, The Better Business Bureau, Inc., ("BBB"), moves for summary judgment. [DE 23]. Plaintiff, James Paul Blakeley ("Blakeley"), responded and BBB replied. [DE 28; DE 30]. This matter is ripe for adjudication. For the reasons below, BBB's motion for summary judgment is **DENIED**.

## I. BACKGROUND

Blakeley began working for BBB as Director of Special Projects in October 2014. [DE 28 at 293]. BBB is a nonprofit organization that works with businesses to promote ethical business practices and consumer trust. [DE 23-1 at 84]. In August 2018, Blakeley became Executive Director of Business Development, and his title later changed to Executive Vice President of Business Development. [DE 28 at 293–94; DE 23-1 at 84–85 & n.2]. His responsibilities included supervising sales staff, maintaining relationships with accredited businesses, developing strategic plans, and conducting employee performance reviews. [DE 23-1 at 85; DE 28 at 293]. Reanna Smith-Hamblin ("Smith-Hamblin"), BBB's Chief Executive Officer, supervised him. [DE 28 at 293].

Blakeley was diagnosed with attention deficit hyperactivity disorder ("ADHD") in 2014 and with major depressive disorder and anxiety disorder in 2021. [DE 28-2 at 397]. He described

difficulties with concentration, organization, prioritization, following through on tasks, and sleep, as well as periods of persistent sadness, fatigue, and loss of enjoyment. [DE 28 at 294–95]. Blakeley treated his conditions with medication, therapy, and psychiatric care. [DE 28-2 at 398, 400–02; DE 28 at 295–97]. Although treatment helped manage his symptoms, his depression began interfering more substantially with his work and self-care after his mother died in August 2022. [DE 28-2 at 499–500]. His symptoms intensified during 2023, prompting further medication changes. [DE 28-2 at 399–403].

Blakeley's performance evaluations identified difficulties with time management, communication, punctuality, and holding his staff accountable before 2023. [DE 28-2 at 453–55, 485]. In his self-evaluation accompanying the 2021 annual review, Blakeley acknowledged continuing problems with time management and prioritization, while describing his working environment and schedule as flexible and favorable. [DE 23-4 at 117–21]. Smith-Hamblin nevertheless testified that Blakeley received a "pretty good evaluation" for 2021 and that she was pleased with his performance. [DE 28-4 at 685–87]. She also acknowledged that he exhibited similar difficulties in earlier years when she did not have serious concerns about his performance, and that his 2022 evaluation rated him "good" or "excellent" in every category. [DE 28-4 at 696–97]. According to Blakeley, before his termination he had never been formally disciplined, placed on a performance improvement plan, or threatened with termination. [DE 28-1 at 327–28].

In July 2023, Smith-Hamblin conducted Blakeley's midyear performance review and raised concerns about his engagement, communication, responsiveness, time management, and office attendance. [DE 23-5 at 123–24; DE 28-2 at 487–92]. Blakeley acknowledged that several criticisms were fair, but disputed the criticism of his punctuality and attendance. [DE 28-2 at 487–92, 494]. Smith-Hamblin directed him to complete employee reviews in person or by Zoom, revise

one employee's review, calendar recurring sales reports, begin strategic planning, and update a manual describing his job duties. [DE 23-5 at 123–24]. At the time, Blakeley understood these assignments, considered them reasonable, and understood that failing to complete them could result in discipline. [DE 28-2 at 510–11]. When deposed, Smith-Hamblin stated that she was not considering terminating Blakeley or placing him on a performance improvement plan when the review took place. [DE 28-4 at 663].

During the review, Blakeley discussed his mother's death, difficulties sleeping, and problems with his medication. [DE 28-2 at 498–503]. According to Blakeley, he also explained how his conditions affected his work and requested accommodations. [DE 28-1 at 328–29]. He testified that he requested flexible arrival and departure times, additional opportunities to work from home during increases in his symptoms, more timely feedback, assistance with tasks, and guidance distinguishing firm deadlines from those permitting extensions. [DE 28-2 at 406–14]. He explained that working at home reduced distractions and that clearer priorities and more frequent feedback would help him complete assignments and address deficiencies before his next formal review. [*Id.*]. Blakeley testified that Smith-Hamblin agreed to provide additional work-from-home days, flexibility in his arrival time, and more timely feedback. [*Id.*; DE 28 at 302]. Smith-Hamblin denies that Blakeley requested accommodations during his mid-year review or in the latter half of 2023. [DE 28-4 at 661–63, 693].

The parties also dispute what occurred after that review. [DE 28 at 303–305; DE 30 at 777–79]. Blakeley alleges that Smith-Hamblin began restricting remote work and objecting to flexible start times shortly after he requested accommodations. [DE 28-1 at 329–31]. He further testified that she provided "hardly any feedback" and repeatedly deferred or rebuffed his attempts to discuss the assistance he needed. [DE 28 at 304–305; DE 28-1 at 329–31]. His affidavit describes being

excluded from leadership discussions and decisions concerning his subordinates that previously would have involved his input. [DE 28-1 at 329–31]. BBB maintains that Blakeley was not prohibited from working remotely, but was expected to be in the office during business hours to communicate with his direct reports. [DE 30 at 778 n.5]. It also maintains that the July review supplied clear instructions, and that Smith-Hamblin subsequently reminded him to complete the assignments. [*Id.* at 777–78].

Blakeley acknowledged that Smith-Hamblin asked about the overdue employee reviews during the fall and early winter, although he described those reminders as infrequent. [DE 28-2 at 541–42]. He also acknowledged that the July assignments remained incomplete by January 2024 and that his disengagement had persisted. [*Id.* at 542–43]. Blakeley, however, testified that he continued seeking the promised assistance throughout the remainder of 2023. [DE 28-1 at 329–31]. On December 13, 2023, Smith-Hamblin emailed him thanking him for his dedication, his assistance guiding and growing sales, and his support during difficult personal circumstances. [DE 28-5 at 738].

BBB's conflict-of-interest policy required employees to disclose outside business affiliations, and Blakeley had submitted a disclosure in 2015. [DE 23-8 at 131–34, DE 28-2 at 439]. During his employment, Blakeley created JPaulBlakeley.com and formed River City Pauly LLC, later doing business as RCP Media, without disclosing those activities to BBB. [DE 28-2 at 377, 438–40]. River City Pauly is an entertainment management company initially formed to monetize his social-media presence, and he began managing a musician in 2023. [DE 28-2 at 352–54, 377–78]. He acknowledged performing some work for that business on BBB time and using his BBB computer. [DE 28-2 at 382, 442–45]. Blakeley maintained that his prior training required

disclosure of board service and ownership interests in businesses that could compete with BBB. [DE 28-1 at 327–28].

Smith-Hamblin terminated Blakeley's employment on February 26, 2024. [DE 28-1 at 331; DE 28 at 306]. BBB states that she made that decision because Blakeley failed to complete the July assignments and violated its conflict-of-interest policy. [DE 23-1 at 92–94; DE 30 at 779 & n.6]. BBB maintains that Smith-Hamblin discovered the undisclosed businesses before the termination, but acknowledges that she learned of Blakeley's use of BBB time for outside work afterward. [DE 23-1 at 93–94 & n.11]. Blakeley disputes that outside-business concerns motivated the decision, stating that Smith-Hamblin referred to his performance evaluations during the termination meeting and did not mention his outside activities or alleged misconduct. [DE 28 at 306, 323–24; DE 28-1 at 331]. Although Blakeley relies on Smith-Hamblin's deposition testimony identifying job performance as the reason for his termination, BBB points to her additional testimony that both performance and ethical concerns contributed to the decision. [DE 28 at 323–24; DE 30 at 779 n.6; DE 28-4 at 654–55].

Blakeley filed an EEOC charge on June 24, 2024, and received a notice of right to sue on September 26, 2024. [DE 1-1 at 12]. He then brought this action, asserting claims for disability discrimination, retaliation, and failure to accommodate. [*Id.* at 12–15]. BBB seeks summary judgment on all three claims. [DE 23-1 at 84].

## II. DISCUSSION

### A. Summary Judgment Standard

Under Federal Rule Civil Procedure 56, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists "if the evidence

is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). The essential inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

The movant has the initial burden to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant, who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256 (discussing Fed. R. Civ. P. 56(e)). "The court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

Both parties must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). Alternatively, either party can meet its burden by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(b).

It is not enough for the nonmovant to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. Rather, the nonmovant must sufficiently allege a fact that, if proven, "would have [the] effect of establishing or refuting one of essential elements of a cause of action or defense asserted by the parties." *Midwest Media Prop., L.L.C. v. Symmes Twp., Ohio*, 503 F.3d 456, 469 (6th Cir. 2007) (alteration in original) (quoting

*Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (internal quotation marks omitted)). If the nonmoving party does not respond with specific facts showing a genuine issue for trial, summary judgment is appropriate. *Emmons v. McLaughlin*, 874 F.2d 351, 353 (6th Cir. 1989).

Blakeley alleges three claims under the Americans with Disabilities Act ("ADA") (42 U.S.C. § 12101 *et seq.*) and Kentucky Civil Rights Act ("KCRA") (K.R.S. § 344.040): (1) discrimination; (2) failure to accommodate; and (3) retaliation.[1]

B. Count One: Disability Discrimination under the ADA and KCRA

To recover on a claim for discrimination under the ADA and KCRA, Blakeley must show that he (1) is disabled; (2) is otherwise qualified to perform the essential functions of the position, with or without accommodation; and (3) suffered an adverse employment action because of his disability. *See Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1178 (6th Cir. 1996); *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 317, 321 (6th Cir. 2012) (en banc) (abrogating *Monette* in part by holding that a plaintiff must show that he or she suffered an adverse employment action "because of" rather than "solely by reason of" disability). To satisfy the last prong, Blakeley may introduce "direct evidence of discrimination, including evidence that the employer relied upon the plaintiff's disability in making its employment decision, or . . . indirect evidence of discrimination." *Monette*, 90 F.3d at 1178 (citation omitted).

[1] Neither party disputes that Blakeley's claims under the ADA and KCRA require proof of the same elements. Indeed, as other courts have noted, the KCRA's language parallels that of the ADA and Kentucky courts interpret the KCRA consistently with the federal statute. *Howard Baer, Inc. v. Schave*, 127 S.W.3d 589, 592 (Ky. 2003); *Bryson v. Regis Corp.*, 498 F.3d 561, 574 (6th Cir. 2007). Accordingly, for purposes of evaluating Blakeley's claims under the ADA and KCRA based on discrimination, failure to accommodate, and retaliation, the Court will look to the federal statute for both sets of claims. Where the statutes diverge, however, the Court will note those differences and analyze the claims separately.

A plaintiff can establish a direct prima facie case by bringing direct evidence of discriminatory intent, such as a facially discriminatory employment policy or express statements of desires to remove employees. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

Cases relying on indirect evidence employ the *McDonnell Douglas* burden-shifting framework at summary judgment. *Hrdlicka v. Gen. Motors, LLC*, 63 F.4th 555, 566 (6th Cir. 2023). First, Blakeley must make out a prima facie case of disability discrimination. This requires him to show that (1) he has a disability, (2) he is otherwise qualified for the position, with or without a reasonable accommodation, (3) he suffered an adverse employment decision, (4) his employer knew or had reason to know of his disability, and (5) he was replaced or his position remained open. *Id.* Second, if Blakeley makes the requisite showing, the burden shifts to BBB to provide "a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* at 567 (quotation omitted). Finally, if BBB offers a legitimate, non-discriminatory reason for its action, then the burden shifts back to Blakeley to show that BBB's provided reason amounts to "pretext designed to mask discrimination." *Id.* at 567 (quotation omitted).

Direct and indirect evidence claims are mutually exclusive, as such a mixed-motive analysis is not warranted if a plaintiff fails to meet their burden to offer direct evidence. *Wexler v. White's Fine Furniture*, 317 F.3d 564, 585 (6th Cir. 2003). Because Blakeley offers no direct evidence of discrimination, the Court will evaluate his claim for disability discrimination under the *McDonnell Douglas* burden-shifting framework for claims based on indirect evidence.[2]

---

[2] Because the *McDonnell Douglas* framework applies to indirect evidence claims involving several types of discrimination, courts often look to how the framework is applied in one context to determine its application in another. *See, e.g.*, *Waggoner v. Carlex Glass Am*., LLC, 682 F. App'x 412, 415 (6th Cir. 2017) (citing *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006), which dealt with sex discrimination, to resolve an ADA claim); *Equal Emp. Opportunity Comm'n v. Dolgencorp, LLC*, 277 F. Supp. 3d 932, 945 (E.D. Tenn. 2017), *aff'd*, 899 F.3d 428 (6th Cir. 2018) (citing *Key v. Cincinnati Hamilton Cty. Cmty. Action Agency*, No. 1:09–CV–139, 2011 WL 4543892, at *10 (S.D. Ohio 2011), which dealt with race and age discrimination, to resolve an ADA claim).

1. *Whether Blakeley was "disabled" is a genuine dispute of material fact.*

BBB challenges only the first element of *McDonnel Douglass*, or whether Blakeley has a disability. Although its arguments about his unfinished work and proposed accommodations also bear on whether he was otherwise qualified, BBB does not separately develop a challenge to that element of his discrimination claim. Nor does it dispute that BBB terminated Blakeley or expressly challenge the knowledge and replacement elements. The Court therefore begins with the parties' dispute over disability.

BBB argues that Blakeley's ADHD, anxiety, and depression do not substantially limit any major life activity. Specifically, BBB contends that Blakeley has not shown that his difficulties with concentration and time management substantially limit him compared to the general population. [DE 23-1 at 100–102].

Under the ADA, as amended in 2008, disability is defined as "a physical or mental impairment that substantially limits one or more major life activities of [the] individual," or "a record of such an impairment," or "being regarded as having such an impairment." 42 U.S.C. § 12102(1); *see also Talley v. Fam. Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1106–07 (6th Cir. 2008). The statute defines "major life activities" in "general" as "includ[ing], but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). Thus, Blakeley must show not only that he actually has a mental impairment but also that the "impairment substantially limit[ed] one or more major life activities." *Williams v. AT&T Mobility Servs., LLC*, 186 F. Supp. 3d 816, 823 (W.D. Tenn. 2016) (citing 29 C.F.R. § 1630.2(j)(1)(ii)). "In deciding whether an individual is substantially limited in a major life activity, courts should consider the nature and severity of the

impairment; the duration or expected duration of the impairment; and the permanent or long term impact, or expected permanent or long term impact, of the impairment." *Penny v. United Parcel Serv.*, 128 F.3d 408, 414 (6th Cir. 1997).

The ADA, as amended by the Americans with Disabilities Act Amendments Act of 2008 ("ADAAA"), rejected a demanding definition for "substantially limits." *Id*. Under the expanded ADAAA, an impairment is a disability under the ADA if it substantially limits an individual's ability to perform a major life activity as compared to most people in the general population. *Id*. Any "determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures." *Williams*, 186 F. Supp. 3d at 824 n.47 (quoting 29 C.F.R. § 1630.2 (j)(1)(vi)). The KCRA, however, still follows the ADA's pre-ADAAA definition of disability, such that plaintiffs bringing a claim under the KCRA do not receive the benefits of an expanded definition of disability. *Larison v. Home of the Innocents*, 551 S.W.3d 36, 43 (Ky. App. 2018) (citing *Azzam v. Baptist Healthcare Affiliates, Inc.*, 855 F. Supp. 2d 653, 657 (W.D. Ky. 2012)). *Grainger v. Hoskin & Muir, Inc.*, *No*. 3:19-CV-00347-GNS, 2019 WL 6684524, at *12 (W.D. Ky. Dec. 6, 2019).

Although an ADHD diagnosis, standing alone, does not establish a disability, an individual's ADHD symptoms may qualify as a disability under the ADA where an individualized assessment of the facts shows that those symptoms satisfy the statutory definition. *Allen v. Middle Tennessee Sch. of Anesthesia, Inc.*, No. 3:20-CV-00903, 2022 WL 10551094, at *7 n.4 (M.D. Tenn. Oct. 18, 2022). For major depressive disorder, EEOC regulations identify major depressive disorder as an impairment that will "virtually always" substantially limit brain function. *Williams*, 186 F. Supp. 3d at 825 (citing 29 C.F.R. § 1630.2(j)(3)(i)–(ii)).

Here, the record shows that because of his diagnoses, Blakeley has a mental impairment that substantially limits major life activities, including his ability to care for himself, sleep, concentrate, think, and work. Blakeley testified that his ADHD caused difficulty focusing, concentration, organizing, prioritizing, and following through on tasks, as well as brain fog, forgetfulness, and difficulty keeping track of time. [DE 28-2 at 405–20; DE 28 at 294]. His ADHD also disrupted his sleep at night and caused a strong urge to sleep during the day. [DE 28-2 at 406; DE 28 at 294]. His medical records document recurring cognitive symptoms, including feeling "in a fog" when he missed medication. [DE 28-3 at 1156, 1278]. Blakeley's major depressive disorder caused nightmares, feelings of uselessness and worthlessness, persistent sadness, fatigue, and further sleep disruption. [DE 28-2 at 420]. He testified that he experienced "no pleasure in life" during depressive episodes and described his depression as an unending mental "storm." [*Id.*]. After his mother's death, his depression interfered with his ability to work and care for himself, and he struggled to get out of bed "most days." [*Id.* at 499]. Although his condition temporarily stabilized, his medical records show that his ADHD and depressive symptoms escalated between May and November 2023, requiring new and increased medication. [*Id.* at 401–03].

BBB's reliance on the effectiveness of Blakeley's medication does not defeat a showing of disability under the ADA. Although BBB emphasizes that medication helped him "immensely" and that his depression temporarily stabilized, the statute directs the Court to assess his limitations without those beneficial effects. *See* 42 U.S.C. § 12102(4)(E)(i) ("The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as . . . medication[.]"). The medical records document that, when Blakeley missed medication, he felt "in a fog" and was "very much negatively affected." [DE 28-3 at 1156, 1278]. Those reports support his claimed limitations by

describing difficulties that returned without medication's beneficial effects—the condition in which the ADA requires the Court to assess his impairment. Nor does temporary stabilization resolve the inquiry, because an impairment may qualify based on its effects when active. *See id.* § 12102(4)(D) ("An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active."). In any event, the record documents renewed "breakthrough symptoms" starting in 2021 despite ongoing treatment. [DE 28-2 at 401–03; DE 28-3 at 1224].

Viewed in the light most favorable to Blakeley, the evidence permits a reasonable jury to find that his ADHD or major depressive order substantially limited concentrating, thinking, sleeping, or caring for himself.[3] His descriptions of persistent cognitive symptoms and depressive episodes, confirmed by provided medical records, provide evidence of limitations beyond the ordinary difficulties with focus and time management that BBB identifies. Accordingly, Blakeley has produced sufficient evidence to satisfy the disability element for purposes of BBB's motion on his ADA discrimination claim.

The KCRA's narrower definition requires a separate inquiry. Under the pre-ADAAA standard, the Court considers "[1] the nature and severity of the impairment; [2] the duration or expected duration of the impairment; and [3] the permanent or long-term impact, or the expected

[3] To the extent BBB relies on Blakeley's ability to work more than forty hours a week, travel, care for himself, perform household chores, pursue other employment, and develop an outside business, those activities do not conclusively establish that his impairments did not substantially limit concentrating, thinking, or sleeping. [DE 23-1 at 99–103]. Rather, that evidence must be considered alongside his deposition testimony and medical records describing those limitations. Resolving the competing evidence would require weighing it, a task reserved for the jury at this stage. *Anderson*, 477 U.S. at 249.
Blakeley also identifies Anxiety Disorder as a disabling condition. The briefing, Blakeley's deposition testimony, and his medical records frequently discuss his Major Depressive Disorder and Anxiety Disorder together, making their respective effects difficult to disentangle. Because the evidence concerning his depression and ADHD is sufficient to satisfy his burden on disability at summary judgment, the Court need not separately determine whether his anxiety also qualifies.

permanent or long-term impact of or resulting from the impairment." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 196 (2002), *superseded by statute* Pub. L. No. 110-325, 122 Stat. 3553 (2009). "Merely having an impairment does not make one disabled for purposes of the ADA [and KCRA]." *Koch v. Thames Healthcare Group, LLC*, 855 Fed. App'x 254, 258–59 (6th Cir. 2021) (quoting *Williams*, 534 U.S. at 195). "'Under Kentucky law temporary impairments do not qualify as disabilities' either." *Id.* (quoting *Larison*, 551 S.W.3d at 43). "Therefore, 'a person whose . . . mental impairment is corrected by mitigating measures still has an impairment, but if the impairment is corrected it does not substantially limi[t] a major life activity.'" *Id.* (quoting *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483 (1999)), *superseded by statute* Pub. L. No. 110-325, 122 Stat. 3553 (2009) (cleaned up).

Viewed in Blakeley's favor, the evidence discussed *supra* describes persistent limitations rather than temporary interruption in otherwise effective treatment. Notably, this evidence distinguishes this case from *Koch*, where the plaintiff "was fully capable of working when she was medicated" and incapacity lasted only four days when medication was unavailable. 855 Fed. App'x at 259. Blakeley was often unable to work effectively even with medication, and periods of "breakthrough" symptoms lasted months rather than days. [DE 28 at 296, DE 28-3 at 1224]. In response, BBB points to Blakeley's continued ability to work, travel, and perform daily activities, but those activities must be considered alongside the evidence of limitations that persisted despite treatment. [DE 28-2 at 401–03]. Considering their severity and duration, a reasonable jury could find that Blakeley's remaining limitations were substantial even after accounting for medication's beneficial effects. *Koch*, 855 Fed. App'x at 259. Accordingly, Blakeley has produced sufficient evidence to satisfy the disability elements for purposes of BBB's motion on his KCRA discrimination claim.

*2. McDonnell Douglas: Legitimate Non-Discriminatory Reason*

Having made a prima facie case, the Court will next analyze whether BBB establishes that it had a legitimate, nondiscriminatory reason for terminating Blakeley. If BBB makes this showing, then Blakeley must present evidence that would allow the jury to find that BBB's explanation is mere pretext for unlawful discrimination. *Yarberry v. Gregg Appliances, Inc*., 625 F. App'x 729, 738 (6th Cir. 2015) (quoting *Monette*, 90 F.3d at 1185–86 (abrogated on other grounds by *Lewis*, 681 F.3d 312)).

BBB identifies Blakeley's failure to complete assigned work and violations of its conflict-of-interest policy as legitimate, non-discriminatory reasons for his termination. It points to Blakeley's deposition testimony and his July 2023 performance review, in which Blakeley acknowledged that the assignments were reasonable, timely employee reviews were an essential job duty, and failing to complete the work could result in discipline—yet admitted that the tasks remained unfinished months later. [DE 28-2 at 439, 541–42; DE 23-8 at 131–34]. BBB also relies on the conflict-of-interest policy signed by Blakeley, documents showing Blakeley's undisclosed outside businesses, and his deposition testimony that he used BBB time and equipment for outside work despite understanding that doing so was inappropriate. [DE 23-8 at 131–34]. The Sixth Circuit has held that "[p]oor performance is a legitimate, nondiscriminatory reason for terminating a person's employment." *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 546 (6th Cir. 2008). As is violation of a company's policy. *Sybrant v. Home Depot, U.S.A., Inc.*, 560 F.3d 553, 558 (6th Cir. 2009). Thus, BBB's proffered explanation for terminating Blakeley satisfies its burden of explanation. *See Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254 (1981) ("The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient

if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.").

*3. Mere Pretext*

Because BBB has articulated legitimate nondiscriminatory bases for Blakeley's termination, Blakeley must now show, by a preponderance of the evidence, that BBB's legitimate bases are pretextual for disability discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993). At this stage, Blakeley need only establish that a reasonable jury could conclude that BBB's reasons for terminating him, or treating him differently compared to similarly situated individuals, are pretextual. *Strickland v. City of Detroit*, 995 F.3d 495, 513 (6th Cir. 2021).

To establish pretext, a plaintiff will usually need to show "that the employer's stated reason for the adverse employment action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action." *Risch v. Royal Oak Police Dep't.*, 581 F.3d 383, 391 (6th Cir. 2009) (internal quotation marks omitted). A plaintiff "may also demonstrate pretext by offering evidence which challenges the reasonableness of the employer's decision to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation." *Id*. "[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false and that discrimination was the real reason." *Hicks*, 509 U.S. at 515. As such, to survive summary judgment a Plaintiff must offer evidence which "call[s] into question the veracity of" the employer's explanation. *Rufo v. Dave & Busters, Inc*., No. 06-3111, 2007 WL 247891, at *4 (6th Cir. 2008). An employee's own speculation, unsupported by fact, is not enough to establish pretext. *Upshaw v. Ford Motor Corp*., 576 F.3d 576, 587 (6th Cir. 2009). Nor is "mere conjecture that the employer's explanation is a pretext for discrimination a basis for denying summary judgment." *Id*.

Here, Blakeley's evidence bears principally on whether BBB's stated reasons actually motivated his termination. *Risch*, 581 F.3d at 391. "A plaintiff using [this] option [to show pretext] 'admits the factual basis underlying the employer's proffered explanation and further admits that such conduct could motivate dismissal,' but 'attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant.'" *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003 (quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir.1994))). BBB argues that Blakeley cannot establish pretext because he admitted to failing to complete assignments and engaging in the outside-business conduct BBB cites. [DE 30 at 782]. Those admissions support the factual basis for BBB's explanations, but they do not establish that the conduct actually motivated his termination and Blakeley may still offer evidence to the contrary.

Blakeley argues that BBB's stated reasons did not actually motivate his termination, pointing to its prior treatment of similar performance issues, Smith-Hamblin's changed treatment of him after he disclosed his conditions and requested accommodations, and shifting explanations for his discharge. [DE 28 at 319]. He relies on Smith-Hamblin's deposition testimony that he received favorable evaluations despite longstanding difficulties with focus and time management, and on his own deposition testimony and affidavit that Smith-Hamblin subsequently restricted his flexibility, withdrew support, and excluded him from workplace decisions. [*Id.* at 298–305, 319–323]. Blakeley also disputes that ethical concerns motivated the decision. He points to Smith-Hamblin's deposition testimony identifying "job performance" as the reason for termination and his affidavit stating that she did not mention outside businesses or misconduct during the termination meeting. [*Id.* at 306–07, 323–24]. He further relies on the absence of an investigation or opportunity to explain his outside activities and the post-termination dates on BBB's website

exhibit to question whether those concerns formed part of the decision when it was made. [*Id.* at 322–24].

As to performance, Smith-Hamblin acknowledged that Blakeley had exhibited similar difficulties with focus, time management, and punctuality in prior years, when she nevertheless gave him favorable evaluations and did not have serious concerns about his performance. [DE 28-4 at 685–87, 696–97]. Blakeley also testified that, after he disclosed his conditions and requested accommodations, she restricted his flexibility, withdrew feedback and support, and rebuffed his attempts to discuss the assistance he needed. [DE 28-1 at 329–31]. The significance of this evidence lies in the change in her response to difficulties she had previously tolerated. Viewed in Blakeley's favor, that change could permit a reasonable jury to question the veracity of BBB's performance explanation and infer that his disclosed conditions and accommodations needs instead prompted the decision. *Rufo*, 2007 WL 247891, at *4.

The evidence concerning Blakeley's conflict of interest also raised a question about BBB's actual motivation. BBB points to Smith-Hamblin's additional deposition testimony identifying "both" performance and ethical concerns as reasons for termination. [DE 30 at 779 n.6]. That testimony weakens Blakeley's characterization of her explanation as limited to performance. His challenge, however, also rests on evidence that she did not mention outside businesses or misconduct during the termination meetings, did not investigate the alleged violations or give him an opportunity to explain, and relied on a website exhibit bearing post-termination dates. [DE 28 at 306–07, 322–24; DE 28-1 at 329–31]. Although none of those circumstances independently establishes that BBB changed its explanation, they bear on whether ethical concerns actually contributed to the decision when it was made. *Risch*, 581 F.3d at 391.

Considered together, this evidence supplies more than Blakeley's "own speculation" about BBB's motives. *Upshaw*, 576 F.3d at 587. A reasonable jury could credit Blakeley's account of the changed treatment and question whether BBB's stated reasons explain his termination or mask disability discrimination. *Strickland*, 995 F.3d at 513. Accordingly, viewed in the light most favorable to Blakeley, the evidence creates a genuine dispute as to pretext; and therefore the Court **DENIES** summary judgment on Blakeley's disability discrimination claim.

C. Count Two: Retaliation under the ADA, Title VII, and KCRA

Blakeley also brings a claim for retaliation against BBB under the ADA, Title VII, and the KCRA. [DE 1-1 at 13–14]. His argument is two-fold: (1) Smith-Hamblin retaliated against him by first imposing restrictions and withdrawing support, and then (2) terminating him. [DE 28 at 319–22]. BBB disputes whether that preceding conduct was materially adverse, characterizing it as workplace slights, and argues that Blakely has not established a causal connection between his requests and his termination seven months later. [DE 30 at 781].

Title VII prohibits employers from discriminating against an employee because the employee has engaged in conduct protected by the act. *Laster v. City of Kalamazoo*, 746 F.3d 714, 729 (6th Cir. 2014) (citing 42 U.S.C. § 2000e-3(a)). The KCRA similarly makes it unlawful "[t]o retaliate or discriminate in any manner against a person because he has opposed a practice declared unlawful by this chapter, or because he has made a charge, filed a complaint, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this chapter." KY. REV. STAT. ANN. § 344.280(1). Similar to discrimination claims, retaliation claims under the KCRA are evaluated under the same standard as Title VII. *See Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 504 (6th Cir. 2014) (citing *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428,

435 (6th Cir. 2009)); *Brooks v. Lexington-Fayette Urb. Cnty. Hous. Auth.*, 132 S.W.3d 790, 801–02 (Ky. 2004).

To demonstrate a prima facie case of retaliation, a plaintiff must show that: "(1) the plaintiff engaged in protected activity; (2) that the exercise of [her] civil rights was known by the defendant; (3) that, thereafter, the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action." *Wilson v. Bosse*, 2020 WL 7295207, *4 (Ky. Ct. App. Dec. 11, 2020) (citing *Ky Ctr. for the Arts v. Handley*, 827 S.W.2d 697, 701 (Ky. App. 1991)); *Asbury Univ. v. Powell*, 486 S.W.3d 246, 254 (Ky. 2016); *see also*, *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008). The last element requires the plaintiff to demonstrate "but-for" causation. *Beard v. AAA of Michigan*, 593 F. App'x 447, 551 (6th Cir. 2014). "But for" causation exists when the unlawful retaliation would not have occurred in the absence of the alleged action. *Id.* Still, "[t]he plaintiff's burden at the prima facie stage is minimal, requiring merely that the plaintiff establish 'that the protected activity and the adverse action were not wholly unrelated.'" *Taylor v. Bd. of Educ. of Memphis City Schs.*, 240 F. App'x 717, 721 (6th Cir. 2007) (citing *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997)). If Blakeley demonstrates a prima facie case, the burden shifts to BBB to demonstrate a legitimate non-retaliatory reason for the adverse employment actions. *McDonnell Douglas Corp.*, 411 U.S. at 803. Once BBB does so, the burden shifts back to Blakeley to demonstrate that BBB's reason was pretextual. *Hamilton*, 556 F.3d at 435.

Moreover, as with discrimination claims, KCRA retaliation claims can be established either through direct evidence of retaliation or through circumstantial evidence that would support an inference of retaliation. *Laster*, 746 F.3d at 730. A plaintiff's burden of establishing an adverse employment action is "less onerous in the retaliation context than in the anti-discrimination

context." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 595–96 (6th Cir. 2007) (quoting *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 67–71 (2006)). And for purposes of a retaliation claim, an adverse employment action is one that "a reasonable employee would have found . . . materially adverse," such that "'it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Bender v. Gen. Dynamics Land Sys., Inc.*, 2020 WL 4366049, at *7 (E.D. Mich. July 30, 2020) (quoting *Laster*, 746 F.3d at 727). This is a "relatively low bar." *Michael*, 496 F.3d at 596.

As with his discrimination claim, Blakeley does not allege any direct evidence of retaliation. Instead, he focuses on circumstantial evidence under the *McDonell Douglas* burden shifting framework. BBB does not separately challenge protected activity, its knowledge of Blakeley's accommodation requests, or that it terminated him. Rather, it argues that Blakeley has not established a causal connection between his requests and his termination seven months later. [DE 30 at 781–82]. The Court therefore considers whether Blakeley's evidence establishes the necessary causal connection to his protected activity to sustain his prima facie case. Then, whether BBB's previously identified reasons for termination were pretextual for retaliation.

*1. Causal Nexus Under Blakeley's Prima Facie Case*

Blakeley argues that Smith-Hamblin retaliated against him by imposing restrictions and withdrawing support and then terminating him in February 2024. He asserts after requesting accommodations, Smith-Hamblin restricted remote work and flexible arrival times that he previously enjoyed. [DE 28-1 at 328–30]. She also provided "hardly any feedback" and repeatedly deferred or rebuffed his attempts to discuss the guidance he needed to perform his work. [*Id.*]. Viewed in context, these changes concern access to working conditions and supervisory assistance that Blakeley identified as important to managing his symptoms and completing assignments. A

reasonable jury could find that their withdrawal would dissuade a reasonable employee from requesting accommodations. *Michael*, 496 F.3d at 595–96; *White*, 548 U.S. at 67–71. This conclusion rests on the described changes to his working conditions, rather than his sense that Smith-Hamblin was unfriendly or unsupportive as BBB suggests.

Blakeley further argues that Smith-Hamblin's withdrawal of help and "secret scrutiny of him" before termination indicates pretext, supporting a causal connection to his accommodation requests. [DE 28 at 321, 324]. Relying on *Hamilton*, he argues that "[Smith-Hamblin] began to scrutinize him more in the weeks and months following the protected activity, gathering information that she would ultimately use to justify his ouster," which is a "tactic" recognized by the Sixth Circuit as indicating pretext. [*Id.* at 321]. In *Hamilton*, increased scrutiny following protected activity and termination less than three months later satisfied the plaintiff's prima facie burden of establishing causation. 556 F.3d at 435. There, "[t]he fact that the scrutiny increased [was] critical." *Id.* Although here, Blakeley's termination occurred seven months after his initial accommodation requests, he testified that the restrictions and withdrawal of support began immediately afterward and continued during the intervening months as he repeatedly tried to ask Smith-Hamblin about the accommodations they had discussed. [DE 28-1 at 328–30]. Blakeley's prior performance reviews further support this inference. Smith-Hamblin acknowledged that he had experienced similar difficulties with focus, time management, and punctuality in earlier years, when she nonetheless gave him favorable evaluations and did not have serious concerns about his performance. [DE 28-4 at 685–87, 696–97]. Because in this context "[the Court] must decide what made [BBB] fire [Blakeley] when it did," *Hamilton*, 556 F.3d at 436, Smith-Hamblin's alleged change of heart supports the inference that Blakeley faced increased scrutiny only after his protected activity, even though he was not terminated until seven months later. "When we view

these facts in the light most favorable to [Blakeley], it is clear that there is a genuine issue of material fact. Based on the facts [Blakeley] alleges, a reasonable fact-finder could determine that [BBB] waited for, and ultimately contrived, a reason to terminate [Blakeley] to cloak its true, retaliatory motive for firing him." *Id.* at 437. Blakeley has satisfied his prima facie burden as he has sufficiently alleged a causal connection between his request for accommodations and the "scrutiny" preceding it culminating in this termination..

*2. Pretext*

Since Blakeley demonstrated his prima facie case, the burden shifts to BBB to demonstrate a legitimate non-retaliatory reason for the adverse employment actions. *McDonnell Douglas Corp.*, 411 U.S. at 803. Once BBB does so, the burden shifts back to Blakeley to demonstrate that BBB's reason was pretextual. *Hamilton*, 556 F.3d at 435.

As discussed *supra*, BBB has articulated legitimate reasons for Blakeley's termination: his failure to complete assigned work and violations of its conflict-of-interest policy. The Court also determined that Blakeley presented sufficient evidence to question whether those reasons actually motivated his discharge. That analysis applies with equal force here. Considered alongside his testimony that Smith-Hamblin changed her treatment of him immediately after his accommodation requests, the evidence permits a reasonably jury to find that BBB's stated reasons were pretextual for retaliation. [DE 28 at 298–99, 303–05, 322–24; DE 28-1 at 329–30].

BBB also cited Blakeley's communication deficiencies, including his failure to respond to emails, and the need for him to be available to supervise employees as legitimate reasons for Smith-Hamblin's decision to restrict his remote work and flexible schedule. [DE 30 at 778–79, n.5]. Even assuming that explanation satisfies BBB's burden of production, Blakeley's evidence creates a dispute concerning its actual motivation. He testified that previously available flexibility

was restricted immediately after his requests, although similar performance difficulties and supervisory needs had existed during earlier years when Smith-Hamblin had allowed that flexibility. [DE 28-4 at 685–87, 696–97]. As to the withdrawal of supervisory assistance, BBB rejects that characterization, relying on the instructions and reminders Smith-Hamblin provided to Blakeley as evidence that no such withdrawal occurred. [DE 30 at 777–78; DE 28 at 304–05]. But Blakeley asserts that Smith-Hamblin repeatedly rebuffed his efforts to discuss the guidance he needed. [DE 28-1 at 329–30]. BBB does not separately explain Smith-Hamblin's alleged refusal to discuss the guidance Blakeley requested. Rather, it maintains that the July review and subsequent reminders provided sufficient direction and characterizes his complaints of being ignored or unsupported as trivial workplace slights. [DE 30 at 777–78, 781–82]. Neither contention explains the alleged withdrawal of supervisory assistance following his accommodation requests.

Viewed together and in a light most favorable to Blakeley, the evidence discussed above both calls into question BBB's stated reasons for his termination and supports an inference that his accommodations requests prompted the changes in his working conditions that culminated in his termination. *Hamilton*, 556 F.3d at 436–37. Blakeley has therefore produced sufficient evidence for a reasonable jury to find that BBB's explanations were pretextual and that retaliation was the actual reason for its action. Therefore, summary judgment on the retaliation claim is unwarranted and BBB's motion is **DENIED**.

D. Count Three: Failure to Accommodate under the ADA and KCRA

Because the KCRA is interpreted consistently with federal anti-discrimination law, the Court will analyze Blakeley's claim under the ADA. *Brown v. Humana Ins.*, 942 F. Supp. 2d 723, 730 (W.D. Ky. 2013) (citing *Schave*, 127 S.W.3d at 592 and *Brohm v. JH Props., Inc.*, 149 F.3d 517, 520 (6th Cir. 1998)).“[C]laims premised upon an employer's failure to offer a reasonable

accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination." *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007) (citing *Bultemeyer v. Fort Wayne Cmty. Sch.*, 100 F.3d 1281, 1283 (7th Cir.1996)). As a result, the *McDonnell-Douglas* framework does not apply, and the Court will analyze the claim under the following framework. *Id.* at 869. A plaintiff must show that:

> (1) he is disabled under the ADA; (2) he is otherwise qualified for the position, with or without a reasonable accommodation; (3) his employer knew or had reason to know of his disability; (4) he requested a reasonable accommodation; and (5) the employer failed to provide the reasonable accommodation.

*Aldini v. Kroger Co. of Mich.*, 628 F. App'x 347, 350 (6th Cir. 2015). "If the plaintiff makes this showing, then the burden shifts to the employer to show that the accommodation would cause undue hardship for the employer." *King v. Steward Trumbull Mem'l Hosp., Inc.*, 30 F.4th 551, 560 (6th Cir. 2022). If the employer offers alternative accommodations, the plaintiff must establish both that her preferred accommodation was reasonable, and that the accommodation provided to her was unreasonable. *B.S. v. Carter Cnty. Bd. of Educ.*, No. 24-5045, 2025 WL 764610, at *6–7 (6th Cir. Mar. 11, 2025).

The Court has already determined that Blakeley has produced sufficient evidence of disability for purposes of summary judgment. BBB does not separately challenge its knowledge of his disability or advance an undue hardship defense. Thus, the remaining disputes concern whether Blakeley was otherwise qualified for his position with a reasonable accommodation, whether he requested such an accommodation, and whether BBB failed to provide it. [DE 23-1 at 103–05; DE 30 at 775–79]. Because qualification and the reasonableness of the requested accommodations overlap, the Court addresses those issues together before considering whether BBB provided the accommodations or reasonable alternatives.

1. *Qualification with Reasonable Accommodation*

The Court considers whether Blakely could perform the essential functions of his position with a reasonable accommodation.

The ADA requires employers to "mak[e] reasonable accommodations." 42 U.S.C. § 12112(b)(5)(A). A plaintiff who requires an accommodation bears the burden of proposing an accommodation and showing that it "seems reasonable on its face." *Blanchet v. Charter Commc'ns, LLC*, 27 F.4th 1221, 1229 (6th Cir. 2022) (quoting *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002)). The reasonableness of a proposed accommodation is a question of fact. *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 634 (6th Cir. 1998).

To determine whether an accommodation is reasonable, "the employer must consider (1) the particular job involved, its purpose, and its essential functions; (2) the employee's limitations and how those limitations can be overcome; (3) the effectiveness an accommodation would have in enabling the individual to perform the job; and (4) the preference of the employee." *Kovac v. Superior Dairy, Inc.*, 998 F. Supp. 2d 609, 620 (N.D. Ohio 2014) (citing *Keever v. City of Middletown*, 145 F.3d 809, 812 (6th Cir.1998)). A plaintiff fails to show his accommodation request was reasonable if he cannot "prove it was necessary to accommodate his disability." *McDonald v. UAW-GM Ctr. for Hum. Res.*, 738 F. App'x 848, 853 (6th Cir. 2018) (discussing *Obnamia v. Shinseki*, 569 F. App'x 443, 445 (6th Cir. 2014)). Courts often hold that a request for accommodation that is "too vague" is not reasonable. *Id.*; *see also Cassidy*, 138 F.3d at 635; *Reyes v. Krasdale Foods, Inc.*, 945 F. Supp. 2d 486 (S.D.N.Y. 2013); *Palmer v. Marathon Petroleum Co.*, LP, No. CV 17-68-HRW, 2018 WL 4956110, at *11 (E.D. Ky. Oct. 12, 2018) (holding that requests for "more help" and "additional time" were not reasonable).

Relying on his deposition testimony, Blakeley identifies several adjustments he requested to address the effects of his conditions on his work. He alleges that he asked Smith-Hamblin for

flexibility in his arrival and departure times because of disrupted sleep. [DE 28-2 at 406–14]. He also requested additional work from home during increases in his symptoms, explaining that the office's noise, lighting, and interruptions impaired his concentration. [*Id.*]. Based on his experience working remotely during the COVID-19 pandemic, a "quiet, dimmer, familiar environment" allowed him to focus more effectively. [DE 28 at 301 (quoting DE 28-2 at 405, 409)]. For difficulties with prioritization and follow-through, Blakeley requested more timely feedback, assistance with tasks, and guidance distinguishing inflexible deadlines from those permitting extensions. [DE 28-2 at 406–14]. He explained that this guidance would allow him to concentrate on deadlines that could not be moved and that more frequent feedback would help him correct deficiencies before his annual or semiannual reviews. [DE 28 at 301 (quoting DE 28-2 at 405, 409, 412–15)]. In response, BBB argues that Blakeley failed to request a reasonable accommodation. [DE 23-1 at 103–05].

At this stage, there is sufficient evidence in the record to find that several of Blakeley's requests were reasonable. Blakely requested to work remotely. It is undisputed that Blakeley (and other BBB employees) had already worked remotely for a period because of the COVID-19 pandemic. [DE 28-2 at 448–49]. Second, other courts have found that remote work is a reasonable accommodation. *See Davis v. Kalamazoo Pub. Sch.*, No. 1:24-CV-199, 2025 WL 1789308, at *5 (W.D. Mich. June 30, 2025) (finding teacher's request to teach students virtually from home was not unreasonable). Because working remotely is not unreasonable on its face, the burden shifts to BBB to show that the accommodation would cause undue hardship for the employer. However, BBB does not allege undue hardship, but argues instead that the request is unreasonable because Blakeley would be unable to discharge certain "essential functions" of his job even with this accommodation. These are the same arguments BBB makes *infra*, in support of its claim that

Blakeley is not "otherwise qualified," because he failed to complete assignments despite understanding them and receiving extra time. [DE 30 at 775–78]. Blakeley's failure to complete these assignments, however, has no bearing on whether he would have been able to complete them under the remote work and flexible schedule arrangement he requested.

Blakeley's requests for clearer guidance on deadlines and more frequent feedback are sufficiently specific to be reasonable on their face. *Blanchet*, 27 F.4th at 1229 (quoting *Barnett*, 535 U.S. at 401). BBB argues that these requests amounted to appeals for "grace and understanding" and emphasizes that Blakeley could not identify a particular task for which he requested "help" or a deadline he asked to extend. [DE 30 at 776; DE 28-2 at 412–15)]. Blakeley's inability to identify the assistance he needed or the deadline he sought to extend weakens his showing that those requests were sufficiently specific, because a general request for "help" is "simply too vague to reasonably inform [BBB] of a reasonable accommodation." *Palmer*, 2018 WL 4956110, at *11; *Cassidy*, 138 F.3d at 635. They do not, however, resolve whether his separate requests for deadline guidance and more frequent feedback were sufficiently concrete.

Blakeley alleges that he asked Smith-Hamblin to distinguish firm from flexible deadlines so that he could prioritize assignments that had to be completed on time. [DE 28-2 at 406–14]. He also requested feedback before his annual or semiannual reviews so that he could correct deficiencies associated with his symptoms as they arose. [*Id.*]. Unlike the general request for supervisory feedback to identify ways to "work smarter" in *Lemieux v. Louisville Metro. Gov't*, Blakeley described the guidance he needed and the change he sought in the timing of feedback. No. 3:22-CV-151-RGJ, 2023 WL 8241569, at *4 (W.D. Ky. Nov. 28, 2023). Viewed in his favor, this testimony identifies adjustments to prioritization and supervisions beyond a general request for greater support. BBB's vagueness arguments therefore do not overcome Blakeley's showing

that these requests were reasonable on their face. Whether they could have enabled Blakeley to perform his essential duties is a different question.

Blakeley offers evidence that the proposed changes could improve his ability to perform his duties. His testimony concerning improved concentration while working remotely draws on his experiences performing work in that environment, and he explained how clearer priorities and more frequent feedback would address his difficulties with organization and follow through. BBB counters that earlier performance reviews documented communication problems and that Blakeley acknowledged communicating with his direct reports was part of his job. [DE 30 at 778–79]. Those communication concerns are relevant to whether Blakeley could fulfill his supervisory duties with flexible hours or additional remote work, but they do not establish that the requested adjustments would necessarily prevent him from doing so. The proposed changes must be assessed in light of both their potential benefits, and the duties Blakeley would remain responsible for performing. *Kovac*, 998 F. Supp. 2d at 620.

Nor does Blakeley's failure to complete the July assignments conclusively establish that the proposed accommodations would have been ineffective as BBB suggests. BBB relies on Blakely's admissions that the assignments were reasonable, he understood what was expected, and they remained unfinished despite reminders and more than six months to complete them. [DE 30 at 775–78]. The evidence supports BBB's position that further explanation or additional time alone would not have addressed the problem. [*Id.*]. But Blakeley's requests also concerned the environment in which he worked and the guidance he received in prioritizing assignments. His understanding of the work does not resolve whether those adjustments would have enabled him to perform it. The parties also dispute whether BBB actually provided the requested changes, so his continued difficulties cannot simply be treated as evidence that those changes were ineffective.

Taken together, Blakeley's testimony identifies proposed adjustments, connects them to his disability-related limitations, and explains how they could help him perform his work. Although his general requests for unspecified assistance or extensions would not independently establish a reasonable accommodation, the evidence concerning his more concrete requests creates a genuine dispute as to whether he could perform his essential duties with a reasonable accommodation. *Kleiber*, 485 F.3d at 869–70.

2. *Whether BBB Provided Effective Accommodation.*

The Court next considers whether BBB provided accommodations that adequately addressed Blakeley's limitations. Once a plaintiff requests a reasonable accommodation, it is mandatory for an employer to engage in an interactive process with them. *See Lafata v. Church of Christ Home for Aged*, 325 Fed. App'x 416, 422 (6th Cir. 2009) (quoting *Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 556 (6th Cir. 2008)). Thus, "[a] plaintiff must not only demonstrate the requested accommodation was reasonable but also that any offered alternatives were inadequate." *Palmer*, 2018 WL 4956110, at *11 (citing *Trepka v. Board of Educ.*, 28 Fed. App'x 455, 459 (6th Cir. 2002)).

Blakeley's testimony creates a dispute concerning whether BBB implemented the scheduling flexibility and remote work he requested. He testified that Smith-Hamblin initially agreed to additional remote workdays and flexibility in his arrival time, telling him that there was "no pressure to be here right at 8:00 a.m." because he often worked late. [DE 28-2 at 409]. According to Blakeley, however, Smith-Hamblin subsequently restricted his ability to work remotely and treated his flexible arrival time as a problem. [*Id.* at 409–12]. BBB's reliance on her initial approval therefore does not resolve whether the adjustments were actually available to him. Nor does its assertion that Blakeley could work from home outside ordinary hours establish that it

accommodated his need for a quieter working environment and flexibility during the workday. [DE 30 at 778 n.5].

The evidence similarly permits differing conclusions about whether BBB provided the feedback and guidance Blakeley requested. BBB points to the July performance review's instructions and Smith-Hamblin's subsequent reminders to complete the outstanding assignments. [DE 30 at 775-78; DE 28-2 at 541–42]. Blakeley asserts, however, that after agreeing to provide timely feedback, Smith-Hamblin gave him "hardly any feedback" and repeatedly deferred or rebuffed his efforts to discuss the assistance he needed. [DE 28 at 302, 304–05; DE 28-1 at 329–31]. A jury could distinguish instructions identifying unfinished work from ongoing feedback and guidance addressing the difficulties Blakeley described. His acknowledgment that he understood the assignments does not resolve the dispute.

Finally, BBB's decision to allow additional months to complete the July assignments does not conclusively establish that it provided an effective accommodation. The employer retains the "ultimate discretion" to choose an effective alternative to the employee's preferred accommodation, but the employee may withstand summary judgment by presenting evidence that the alternative was inadequate. *Trepka*, 28 F. App'x at 459–60 (quoting *Hankins v. The Gap*, 84 F.3d 797, 800–01 (6th Cir. 1996)). The assessment must account for the employee's limitations and the accommodation's effectiveness in enabling him to perform the job. *Kovac*, 998 F. Supp. 2d at 620. Thus, Blakeley must present evidence that the additional time was inadequate to accommodate the limitations underlying his requests. *Id.*

Blakeley requested additional time—together with flexible hours, additional remote work, guidance on deadlines, and more frequent feedback. [DE 28-2 at 406–14]. His testimony explains why additional time alone would not necessarily substitute for those other adjustments: office

distractions impaired his concentration, disrupted sleep affected his schedule, and difficulties prioritizing work required guidance about which assignments to complete first. [*Id.*]. He further testified that Smith-Hamblin restricted scheduling flexibility and remote work and repeatedly deferred or rebuffed his efforts to obtain his requested feedback and guidance. [DE 28-1 at 329–31]. Viewed in his favor, this evidence would permit a reasonable juror to find that BBB gave him longer to complete his July 2023 assignments, while leaving unaddressed the difficulties that prevented him from completing them. Accordingly, the dispute concerns the effectiveness of additional time as an alternative to the other requested adjustments, rather than merely Blakeley's preference for those adjustments. He has presented sufficient evidence of that alternative's inadequacy to withstand summary judgment. *Trepka*, 28 F. App'x at 459–60. Accordingly, the Court **DENIES** summary judgment on Blakeley's failure to accommodate claim.[4]

## III. CONCLUSION

For the reasons explained, and the Court being otherwise sufficiently advised, BBB's motion for summary judgment on Blakeley's discrimination, retaliation, and failure to accommodate claims [DE 23] is **DENIED**.

Rebecca Grady Jennings, District Judge
United States District Court

October 6, 2026

[4] The Court also notes Blakeley's argument that BBB failed to disclose witnesses as required by Rule 26 and that Smith-Hamblin's accounts of employee complaints constitute inadmissible hearsay. [DE 28 at 208–10]. BBB responds that its motion relies on Blakeley's deposition testimony and documents produced during discovery, and that any disclosure failure was harmless. [DE 30 at 783–84]. The Court need not resolve these evidentiary objections, because even considering the challenged evidence, genuine disputes of material fact preclude summary judgment. This ruling does not resolve the admissibility of that evidence at trial.